UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ANTIONETTE CROSSGROW                    CIVIL ACTION

VERSUS                                  NUMBER: 12-2052

CAROLYN W. COLVIN, ACTING               SECTION: "J"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


<u>**REPORT AND RECOMMENDATION**</u>

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits based upon disability.  (Rec. docs. 13, 14).

Antionette Crossgrow, plaintiff herein, protectively filed the subject applications for DIB and SSI benefits on June 7, 2010, alleging disability as of March 30, 2010.  (Tr. pp. 129, 111-114, 115-121).  In a Disability Report that appears in the record, the conditions resulting in plaintiff's inability to work were

identified as spinal/back problems, anxiety, and depression. (Tr. pp. 132-140). Plaintiff's applications for DIB and SSI benefits were denied at the initial level of the Commissioner's administrative review process on October 11, 2010. (Tr. pp. 67-70). Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on May 23, 2011 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 71, 72-73, 28-42). On September 6, 2011, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 11-27). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-5). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In her cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

    I.   THE ALJ ACCORDED WEIGHT TO THE OPINION OF A SINGLE
         DECISION MAKER IN VIOLATION OF SSA MEMORANDUM 10-1691,
         SSR 06-3p, AND SSR 96-5p.

    II.  THE DETERMINATION THAT PLAINTIFF IS NOT DISABLED DOES NOT
         ACCOUNT FOR THE EVIDENCE CONTAINED IN EXHIBIT 13F, WHICH
         ESTABLISHED ADDITIONAL LIMITATIONS.

    III. THE DECISION DOES NOT CONTAIN A FINDING ON PLAINTIFF'S
         ABILITY TO SUSTAIN CONSISTENT PACE, WHICH IS
         DETERMINATIVE OF WHETHER THE VOCATIONAL EXPERT TESTIMONY
         ESTABLISHES THAT PLAINTIFF IS DISABLED OR ESTABLISHES

THAT PLAINTIFF IS NOT DISABLED.

(Rec. doc. 13-1, pp. 13-14).

Relevant to the issues to be decided by the Court are the following findings that were made by the ALJ:

1.   [t]he claimant meets the insured status requirements of the Social Security Act through September 30, 2012.

2.   [t]he claimant has not engaged in substantial gainful activity since March 30, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   [t]he claimant has the following severe impairments: back pain, anxiety and depression (20 CFR 404.1520(c) and 416.920(c)).

4.   [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b).  She can lift/carry twenty pounds occasionally and ten pounds frequently; walk/stand four to five hours in an eight hour workday in increments of thirty minutes at a time.  She must be able to alternate sitting and standing after the time increments noted above.  She is able to stoop occasionally, and she is able to grasp, turn, hold, and use her fingers for precise work.   She is able to understand, remember, and carry out simple instructions.  She could not function in positions where there is constant supervision or where there are hourly quotas, but she is able to function satisfactorily in positions where direct supervisory contact occurs no more than 3 or 4 times each morning shift and each afternoon shift.  She is able to work in close proximity to fellow coworkers and with fellow coworkers to accomplish job tasks.  She is able to maintain attention and concentration sufficient to perform work involving simple instructions, but has marked limitations in attention and concentration where job instructions are complex and detailed.  This residual functional capacity is consistent with the record evidence.

6.    [t]he  claimant  is unable to  perform any past  relevant
work (20 CFR 404.1565 and 416.965).

7.    [t]he claimant was born on  October 19, 1969 and was 40
years old, which is defined as a younger individual age 18-49,
on the alleged disability onset date (20 CFR 404.1563 and
416.963).

8.    [t]he claimant has a  limited  education and  is able to
communicate in English (20 CFR 404.1564 and 416.964).

9.    [t]ransferability of  job  skills is not  material to the
determination  of  disability  because  using  the  Medical-
Vocational Rules as a framework supports a finding that the
claimant is "not disabled," whether or not the claimant has
transferable job skills.  (See SSR 82-41 and 20 CFR Part 404,
Subpart P, Appendix 2).

10.  [c]onsidering the  claimant's age,  education,  work
experience, and residual functional capacity, there are jobs
that exist in significant numbers in the national economy that
the  claimant  can  perform  (20  CFR  404.1569,  404.1569(a),
416.969, and 416.969(a)).

11.  [t]he claimant has  not  been  under  a  disability, as
defined in the Social Security Act, from March 30, 2010,
through the date of this decision (20 CFR 404.1520(g) and
416.920(g)).

(Tr. pp. 16, 17, 22, 23).

Judicial review of the Commissioner's decision to deny DIB or

SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries:

(1)  whether  substantial  evidence  of  record  supports  the

Commissioner's decision, and (2) whether the decision comports with

relevant legal standards.  Anthony v. Sullivan, 954 F.2d 289, 292

(5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir.

1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the

Commissioner's findings are supported by substantial evidence, they

are conclusive and must be affirmed.  42 U.S.C. §405(g); Richardson

4

v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1970).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Jones v. Heckler, 702 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts. Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that she is disabled with the meaning of the Social Security Act.  Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A).  Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled.  Harrell, 862 F.2d at 475.  In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

5

1.   an  individual  who  is  working  and  engaging  in substantial  gainful  activity  will  not  be  found  disabled regardless of the medical findings.

2.   an  individual  who  does  not  have  a  "severe impairment" will not be found to be disabled.

3.   an  individual  who  meets  or  equals  a  listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4.   if an individual is capable of performing the work that  she  has  done  in  the  past,  a  finding  of  "not  disabled" must be made.

5.   if an individual's  impairment  precludes her from performing  her  past  work,  other  factors,  including  age, education,  past  work  experience,  and  residual  functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the  initial  burden  of  proving  that  she  is  disabled  and  must ultimately demonstrate that she is unable to perform the work that she has done in the past.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987).  If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist.  Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir.  1985)).   Once  the  Commissioner  demonstrates  that  the individual can perform other work, the burden then shifts back to the claimant to rebut that finding.  Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

The  documentary  evidence  that  was  generated  during  the

6

relevant time period[1]/ begins with records from Dr. William Procell who saw plaintiff on June 2, 2009 for a follow-up visit in connection with joint and shoulder pain.  The impression included elevated cholesterol and polymyositis for which plaintiff was referred to Dr. Vichot, a rheumatologist. (Tr. p. 274).  Plaintiff saw Dr. Procell again two days later for stress and migraine headaches.  An examination of the neck revealed stiffness and tenderness.  The diagnosis was migraines, anxiety, and fatigue. (Tr. p. 273).

On September 10, 2009, plaintiff underwent radiographic studies at the Medical Center of Louisiana at New Orleans ("MCLNO").  X-rays of the hip revealed oblique lucency through the lateral femoral neck, only seen in the frogleg view, and OS acetabula versus labral calcification versus an avulsion fracture of the anterior inferior iliac spine.  A chest x-ray was negative. Studies of the lumbar spine demonstrated a mild decrease in the intervertebral disc space at L1-L2 and those of the cervical spine showed reversal of the lordotic curvature with grade 1 retrolisthesis at C5-C6, slight swelling of the paravertebral soft

---

[1]/ Under 20 C.F.R. §§404.1512(d) and 416.912(d), the Commissioner is required to develop the medical history of a DIB/SSI claimant for at least twelve months prior to the month in which the applications for benefits were filed unless there is reason to believe that development of an earlier time period is necessary.  As plaintiff protectively filed her applications for DIB/SSI benefits on June 7, 2010 and alleged an onset date of March 30, 2010, the relevant time period begins in May of 2009.

tissue of the cervical spine, and degenerative disc disease. X-rays of the pelvis revealed phleboliths but no acute injury. (Tr. pp. 294-298). An MRI of the lumbar spine was subsequently performed on January 19, 2010 which was normal. However, a similar study of the cervical spine showed moderate degenerative changes with straightening of the normal lordotic curve and mild cervical kyphosis; moderate spondylosis on the adjacent posterior surfaces of the vertebrae from C3 to C7 but no cervical disc herniation, stenosis of the spinal canal, or neural foramina; a normal cervical spinal cord; and, incidentally noted moderately enlarged sella containing fluid that was consistent with empty sella. (Tr. pp. 299-300).

On March 11, 2010, plaintiff underwent a transvaginal and transabdominal pelvic ultrasound that demonstrated a lobulated echogenic mass in the uterus that was likely a fibroid. (Tr. pp. 301-302). On March 18, 2010, plaintiff was evaluated by Dr. Lionel Bourgeois of MCLNO following a previous diagnosis of palpitations and a history of some anxiety and depression. Neck and low back pain and some right-sided weakness in the leg were reported. Upon physical examination, plaintiff had mild subjective tenderness on manipulation motion of the neck and subjective lower back pain. Straight leg raising on the right produced some lower back pain but the left was normal and there was no edema of the lower extremities. A neurologic exam was also normal. The assessment

included chronic neck and low back pain with objective findings suggestive of some spondylosis and degenerative changes; a history of atypical chest pain; palpitations; pre-hypertension; tobacco abuse disorder; and, anxiety and depression.  Additional testing was to be scheduled, a referral to mental health care was to be ordered, and plaintiff was counseled on healthy lifestyle choices. (Tr. pp. 284-286).

X-rays of plaintiff's chest that were taken on April 8, 2010 produced normal results.  (Tr. p. 303).  On the following day, plaintiff was seen at MCLNO for complaints of chest pain and palpitations of two days' duration which was described as a sharp, stabbing pain radiating to the neck.  Plaintiff had experienced similar symptoms some months earlier but had only gone to the Emergency Room ("ER") because the pain was associated with left hand numbness.  Nevertheless, plaintiff reported no other neurological deficits, weakness or gait abnormalities, or shortness of breath although general weakness and fatigue were present.  In the "social history" portion of the report it was noted that plaintiff worked as a home health aide.  A physical examination produced unremarkable results.  The examiner's impressions were chest pain, most likely myocardial infarction versus non-cardiac chest pain with atypical chest pain; asymptomatic anemia; anxiety and depression; tobacco dependency; GERD; and, a need for deep venous thrombosis prophylaxis.  Further testing was scheduled and

9

plaintiff was to be started empirically on a proton pump inhibitor. (Tr. pp. 287-289, 305-307). During her brief stay at MCLNO, plaintiff underwent a cardiac stress test which was negative, thus resulting in a change to her diagnosis as atypical chest pain secondary to a GI etiology versus stress/anxiety induced. Use of the protein pump inhibitor resolved plaintiff's chest pain and she was discharged on April 10, 2010 with a diagnosis of atypical chest pain, iron-deficiency anemia, and anxiety disorder. Discharge medications consisted of Zocor, iron, Zantac, and Valium. (Tr. pp. 290-291, 308-312).

On April 28, 2010, plaintiff received a mammogram which produced probable benign findings. (Tr. p. 304). Plaintiff was next seen at the MCLNO Cardiology Clinic on May 6, 2010 after experiencing continued episodes of palpitations and chest pain along with shortness of breath. Upon physical examination, plaintiff's heart had a regular rate and rhythm with no murmurs, rubs, or gallops. Based on the results of the evaluation and a review of the previous test results, plaintiff was discharged from the Cardiac Clinic and was referred to the Psychiatry and Primary Care Clinics. (Tr. pp. 292-293, 312). Plaintiff was subsequently interviewed by an employee of the Disability Determination Services ("DDS") on June 25, 2010 who observed her to have difficulty sitting, noting that she was "... shaking while sitting in [a] chair during [the] interview." (Tr. pp. 129-131).

On July 8, 2010, plaintiff completed the Administration's "Function Report-Adult" form that was designed to elicit information about how her conditions limited her activities. There, plaintiff indicated that she experienced back pain when standing, sitting, laying down, or engaging in almost any activity except preparing quick meals and eating. However, she was able to drive a car and go grocery shopping by herself. She had no hobbies and engaged in no social activities. Plaintiff's conditions reportedly affected all of the activities enumerated on the form. She also had diminished attention; her ability to follow spoken instructions was limited and she could not get along with authority figures, having been fired by the Jefferson Council on Aging due to a perceived anger problem. General paranoia was reported. (Tr. pp. 152-159).

On July 13, 2010, plaintiff was evaluated by Dr. Victor Flynn of the Advanced Medical Center of Gretna/Uptown ("AMC") in connection with a motor vehicle accident that had occurred on June 12, 2010. Following the accident, plaintiff had reportedly been seen at the Ochsner West Bank Clinic on June 17, 2010 at which time medications were prescribed. Primary complaints at the time of the evaluation were neck pain in the trapezius area, 6 out of 10 in severity and intermittent in nature; headaches at a rate of two per week; and, constant low back pain at a level of "10" which radiated into the left foot and was increased with sitting and bending.

Plaintiff recalled a history of low back pain with treatment in the form of injection and pain medications ending in January of 2010. An examination of the cervical spine revealed +1 tenderness to palpation in the paracervical musculature bilaterally and the left trapezius and a mild degree of spasm in the paracervical musculature but a normal range of motion with the pain. An examination of the lumbar spine revealed +3 tenderness to palpation in the paralumbar musculature bilaterally, mild to moderate inter-segmented dysfunction at L3-S1, a mild degree of spasm in the paralumbar musculature, and an active range of motion decreased for flexion 40º with pain noted. Supine straight leg raising was positive for radiation of pain into the left lower extremity, indicative of nerve root irritation. There was also +1 tenderness in the parathoracic musculature bilaterally. The impressions were aggravation of low back pain with radiation of pain into the left foot, cervical spine sprain/strain, and post-traumatic headaches. Recommendations included referral to a medical doctor for evaluation and management, home exercises for the cervical and lumbar spines, and chiropractic treatments once per week for six weeks. (Tr. pp. 335-337, 332).

Plaintiff returned to AMC on July 17, 2010 where she was this time seen by Dr. Jerome Kurpel. She continued to complain of pain throughout the neck, trapezius, and lumbar area that was intermittent in nature with a radicular component to the lower back

that was not significantly improved with Aleve.  A history of low back pain was noted for the previous five to ten years.  Plaintiff also reported a history of some mild depression for which medications had been prescribed and re-evaluation was to occur in the future.  Occupationally, plaintiff was described as a certified nursing assistant who was at that time working as a housewife.

Upon physical examination, plaintiff had tenderness at the basal paracervical along the trapezius musculature, the right greater than the left.  There was some pain with flexion, extension, and lateral rotation of the neck, more so on the left with a pulling sensation on the right but no weakness in the upper extremity.  There was an ache in the right upper extremity with range of motion with a pulling sensation along the trapezius musculature.  No radicular component or instability of the joint were present.  There was also diffuse tenderness and spasms in the lower back area with straightening of the L3, L4, and L5 discs. Plaintiff was said to have significant segmental dysfunction with range of motion of the lower back area and pain in that area with limitations in lateral tilting, flexion, and extension.  However, there was no radicular component in the lower extremities, no pedal edema, and no antalgic gait.  Dr. Kurpel's impression was status-post motor vehicle collision with diffuse paracervical and trapezius muscle spasms, the right greater than the left, with significant lumbar strains and myalgias and segmental dysfunction

at L3, L4, and L5.  Plaintiff was started on Mobic and Zanaflex, was to continue with conservative chiropractic care, and was to return in four weeks after her most recent MRI results were obtained and reviewed.  (Tr. pp. 333-334, 331).

On July 19, 2010, plaintiff received chiropractic treatment at AMC which included manual therapy.  (Tr. p. 330).  She was next seen by Dr. Philip Sack of the MCLNO Medicine Clinic on July 22, 2010 with the chief complaint being throat pain for the previous month between the clavicles and the midesophageal area.  Eating and drinking were unaffected and drinking water actually helped alleviate the pain.  Plaintiff reported increased stress at home after losing her job in the previous month and decreasing her tobacco intake and she had become more reclusive over the previous three months.  Past medical history was positive for pre-hypertension, hyperlipidemia, anxiety, and some questionable depression.  Medications at the time included Meloxicam, Tizanidine, iron sulfate, and Zocor.  A physical examination produced unremarkable results.  The assessment was pre-hypertension that was to be managed through lifestyle changes; hyperlipidemia that was to be treated with Zocor, lifestyle changes, and increased exercise; anxiety/questionable depression, to be treated with Trazodone; obesity, with nutrition and exercise counseling to be obtained; and, overall health maintenance through periodic testing and screening.  (Tr. pp. 318-321).

Plaintiff received further chiropractic treatment at AMC on July 27 and August 2, 2010. (Tr. pp. 329, 328). On August 9, 2010, plaintiff's friend of thirty years, Leishon Darby, completed the Administration's form denominated "Function Report-Adult-Third Party" and provided information on plaintiff's activities. There, Ms. Darby reported that plaintiff's mental status was not up to par, that she was always in pain, and that she was depressed a great deal. Ms. Darby also reported that plaintiff's sleep patterns were poor, that her personal care was declining, and that the meals that she was able to prepare for herself were limited to frozen dinners. Plaintiff performed minimal chores, rarely went outside except to ride in a car, and only went shopping if accompanied by someone else. Other than reading, plaintiff had no hobbies or interests, limited social activities, and was increasingly anti-social, getting upset for no apparent reason. All of plaintiff's activities were affected by pain and depression and walking was limited to one block. Her ability to pay attention, follow instructions, handle stress, and handle changes were compromised and she was increasingly paranoid. (Tr. pp. 169-176).

On August 31, 2010, plaintiff was seen at the Obstetrics & Gynecology Clinic of the Interim LSU Public Hospital for treatment of menorrhagia. (Tr. p. 447). Plaintiff was next seen by Dr. Kimberly Gordon of the MCLNO Psychiatry and Medicine Clinic on

September 2, 2010 who noted that she  had been referred there by Dr. Sack and that she was seeing Dr. Dustin Demoss, who is also a psychiatrist, for medical issues.  The referral was primarily for treatment of plaintiff's anxiety and questionable depression. Plaintiff reported no improvement of her mood or anxiety with Trazodone, she continued to have increased irritability, anxiety, and anger episodes, and she was increasingly socially isolated and having sleeping disturbances.  She denied any suicidal or homicidal ideations, auditory or visual hallucinations, or psychotic or manic symptoms.  On mental status examination, plaintiff was cooperative, pleasant, alert, oriented, and in no acute distress but her mood was significant for feeling bad and frustrated and her affect was agitated and blunted.   Insight and judgment were good.   The assessment was major depressive disorder and anxiety disorder, not otherwise specified, for sixteen years with complaints of significant anger management issues and some personal conflicts. Plaintiff was started on Zoloft and was given the option of tricyclic but use of that medication was thought to be cost prohibitive.  The dosage of Trazodone was increased, Restoril was prescribed for her anxiety, and she was referred to the Tulane Behavioral Clinic for therapy and psychiatric counseling. (Tr. pp. 342-343).

Plaintiff returned to the LSU OB-GYN Clinic on September 16, 2010 and underwent IUD placement.  (Tr. p. 446).  Testing done at

16

the time was suggestive of a benign endometrial polyp. (Tr. pp. 411, 414, 418). On September 30, 2010, plaintiff was seen again by Dr. Sack of MCLNO for medication management/follow-up of her major depressive disorder. Plaintiff denied any complaints and reported some improvement with her mood which was described as "okay". However, she still tended to isolate herself as she became irritable around other people. Although plaintiff's affect was constricted, she was less irritable and agitated, thought processes were linear and goal directed, and there were no suicidal or homicidal ideations, only aggressive thoughts towards others when she was irritable. She also harbored some paranoid thoughts and thus tended to avoid crowds. Plaintiff's insight was limited and her judgment was fair. The assessment was major depressive disorder, increased irritability around other people, rule out social anxiety disorder. The dosages of Zoloft and Vistaril were increased. (Tr. pp. 359-360, 417).

On October 11, 2010, personnel from the State Disability Determination Services ("DDS"), after reviewing plaintiff's file, issued a written decision at the initial level of the administrative review process in which they concluded that plaintiff was not disabled. (Tr. pp. 43, 44). That conclusion was based upon the findings of a Disability Examiner/Single Decision Maker ("SDM"), Mary Awill, and a Psychological Consultant ("PC"), Dr. Lester Barnett. (Tr. pp. 45-55, 56-66). Plaintiff then

17

returned to Dr. Sack on October 21, 2010 and reported that she had been very anxious and depressed following an attack the previous week in which she "... nearly lost her mind."  She complained of increased anxiety, anhedonia, spontaneous crying spells, anger, irritability, and social isolation.  However, she stated that she did not feel "bad about it because people are so negative."  On mental status examination, plaintiff was cooperative but had a blunted affect and a sad mood.  Thought processes were linear and goal-directed and plaintiff denied suicidal/homicidal ideations but added that "I don't want to loose (sic) it."  Judgment and insight were average.  The dosage of Zoloft was increased, that of Trazodone was adjusted, and Neurontin was added to plaintiff's medication regimen.  Referrals were also to be made to the Neurology and Dermatology Clinics.  (Tr. p. 445).

On November 9, 2010, plaintiff presented to the MCLNO ER complaining of a persistent cough over the previous two weeks, subjective fever and chills, increased hoarseness, and some intermittent muscle soreness and tightness in the chest attributed to the cough.  She also complained of some body aches and intermittent vaginal spotting that was possibly related to her IUD. Given the chronicity of plaintiff's cough and her being a smoker, she was given a chest x-ray which was within normal limits.  An EKG revealed sinus tachycardia at 104 but was otherwise normal.  The impression was an upper respiratory infection and plaintiff was

started on Prednisone, Azithromycin, and Tessalon Perles. (Tr. pp. 361-363, 379-380, 408-410, 412-413, 415, 443).

Plaintiff returned to the MCLNO Gynecology Clinic on November 18, 2010 for follow-up care related to her menorrhagia. At her request, the IUD was removed and a hysterectomy was to be scheduled. (Tr. pp. 364-365, 399, 406, 441). Plaintiff returned to the MCLNO ER on November 26, 2010 with complaints of chest pain for the previous five months with a point tenderness to the left breast. Following numerous tests, including two EKG's, two sets of cardiac enzymes, and chest x-rays which revealed no acute changes, plaintiff was discharged and was to receive further workup as an outpatient. (Tr. pp. 366-367, 381-384, 400-405, 437-440).

Sometime in late November or early December of 2010, plaintiff completed the Administration's "Disability Report - Appeal" form and provided an update on her condition. There, she reported that she was suffering from unspecified drug side effects but was unable to see the doctor to have her medications changed. She was also in so much pain and experiencing muscle spasms in the back that it was "driving ... [her] crazy." Her ability to bathe, cook, and style her hair were all affected by her conditions. Plaintiff also reported that she had worked at Children's Place for all of one day in November before having to go to the ER for back pain, muscle spasms, and chest pain. (Tr. pp. 177-184).

On January 18, 2011, plaintiff was seen at MCLNO by Dr. Lionel

Bourgeois who remarked that she had not been seen at that particular clinic since March of 2010, her only other visit there. Plaintiff related a need for a hysterectomy, to have her blood pressure checked, and a history of chronic low back pain and tobacco abuse disorder. Medications at the time included Colace, iron tablets, Zocor, Zoloft, Trazodone, and Zestril. Upon physical examination, plaintiff had subjective lower back tenderness but the results were otherwise largely unremarkable. The assessment was a history of high blood pressure, chronic low back pain, tobacco abuse disorder, lipidemia, and a history of asthma by report. Plaintiff was prescribed hydrochlorothiazide and Robaxin, was counseled on tobacco cessation, was given a prescription for a prior inhaler in case of flareup, and was to be scheduled for various diagnostic testing. (Tr. pp. 368-370, 419). A mammogram was performed the following day which produced normal results. (Tr. p. 398).

Plaintiff was seen again by Dr. Bourgeois on February 17, 2011 for pre-surgical clearance. (Tr. pp. 435, 385, 387, 392-397). She then underwent a psychosocial evaluation at the New Orleans East Behavioral Health Center ("NOEBHC") on February 23, 2011 with the chief complaints at the time being anxiousness, crying, isolation, anger, panic attacks for years, irritability, and poor sleep. Plaintiff recalled a history of domestic violence by her spouse, from whom she had separated, and unreported sexual abuse by a

family member when she was a child.  She owned her own vehicle, enjoyed cooking as a recreational activity, and was active in church.  Plaintiff was cooperative, had good eye contact, and had an appropriate mood and affect.  She projected a positive attitude, stating that she was good at whatever she did, and her goals included getting her GED and learning another trade.  The assessment was a greater than five-year history of anxiety and depression with recent out-patient treatment including Zoloft, Vistaril, and Trazodone.  Plaintiff's stated goals were to stabilize her condition and to feel normal again.  (Tr. pp. 356-358).

On February 24, 2011, plaintiff underwent an ultrasound of the pelvis which revealed an intra-mural leiomyoma measuring 3.7 centimeters.  (Tr. 388-391).  Plaintiff was next seen again by Dr. Bourgeois on February 28, 2011, stating that she was feeling and doing well without any symptom complaints.  Tobacco use had been decreased to two to three cigarettes per day.  Plaintiff had recently restarted her lipid medications after being off of them for an unspecified period of time.  Her chronic low back pain was stable without any new problems or symptoms.  Plaintiff had a history of questionable asthma but no chest pain or shortness of breath.  Upon physical examination, plaintiff had some subjective mild lower back discomfort but otherwise had no acute tenderness. Neurologically, she had good strength in the upper and lower

extremities and a good gait with no limp.  The assessment was a history of high blood pressure, under fair control; a history of intermittent and infrequent asthma, stable; a history of anxiety and depression, stable; a history of hyperlipidemia, with medications having recently been restarted; and a history of fibroid and vaginal bleeding.  Overall, plaintiff was in adequate general health for purposes of her upcoming surgical procedure. (Tr. pp. 371-374, 423-425).

Plaintiff was subsequently seen at the Tulane Urogynecology Clinic on March 1, 2011 for complaints of stress incontinence over the previous six months and urge incontinence over the previous five years which had been progressively worsening.  Episodes of incontinence occurred once or twice per week but plaintiff had not had to restrict her activities because of them.  The impression was mixed incontinence; a fibroid for which definitive surgical treatment was sought; anxiety and depression; and, hypertension. Urodynamic studies were to be scheduled.  (Tr. pp. 375-378, 386, 431-434).

On March 24, 2011, plaintiff was evaluated by Dr. Pamela Jones of NOEBHC pursuant to a referral from her attorney.  Presenting problems were described as a history of depression and anxiety that had worsened over the previous year with diminished concentration, increased anxiety, irritability, isolation, crying spells, and despondence.  Suicidal and homicidal ideations were denied,

anhedonia was present, sleep was poor, but appetite was good. Stressors included unemployment, financial problems, and isolation from some family members. Upon mental status examination, plaintiff had a restricted affect but speech was fluent and thought processes were logical. Insight and judgment were fair. The diagnosis was as follows: Axis I - major depression, single episode; Axis II - deferred; Axis III - hypertension, hypercholesterolemia; and Axis V - a GAF of 55. The prognosis was fair and plaintiff was to be referred to Dr. Windham for laboratory and psychological testing and individual therapy. (Tr. pp. 351-355). On April 26, 2011, plaintiff underwent urodynamic studies at the LSU Outpatient Department. (Tr. pp. 427-430). Plaintiff was seen there again on May 3, 2011 and was cleared for surgery on May 11, 2011. (Tr. p. 426).

As noted earlier, on May 23, 2011, a hearing de novo before an ALJ went forward with plaintiff and a VE in attendance. After they were sworn in as witnesses and exhibits 1A through 11F were admitted into evidence, plaintiff took the stand and was questioned by the ALJ. She was forty-one years old at the time, had completed eleven grades of formal education, and had been certified as a CNA, working in that capacity and providing in-home care for the elderly for over fifteen years until March of 2010. When asked why she had left that line of work, plaintiff explained that the work had slowed down but that she was at any rate preparing to resign

because her back could no longer tolerate the lifting demands of the job.  Since that time, plaintiff had worked for a month in November of 2010 at a retail store called Children's Place.  (Tr. pp. 30-33).

After being tendered to her attorney for further questioning, plaintiff testified that her work at Children's Place was not full time but was done over the holidays and totaled only ten hours. The demands of that job were also problematic as plaintiff was required to stand for four hours at a time which had affected her back.  She went to therapy twice per week for treatment of scoliosis and other conditions affecting her lumbar spine. Plaintiff was scheduled to see her primary care physician on June 8th to develop a treatment plan for her back that included medication which she thus far had been unable to take as it caused an increase in her blood pressure which was contraindicated for her surgery.  Plaintiff had undergone a hysterectomy and a bladder-lifting procedure on May 11th at LSU and the pain medications that had been prescribed were also helpful in alleviating her back discomfort.  (Tr. pp. 33-35).

Plaintiff estimated that she could sit for thirty minutes and stand for ten minutes at a time, for a total of two hours out of an eight-hour workday, before experiencing significant pain.  She thus spent most of her time in bed which was also the result of drowsiness caused by her anxiety, depression, and muscle relaxing

medications.   Despite taking Trazodone, plaintiff still did not sleep fully at night which left her tired during the day. Treatment for her depression, anxiety, confusion, and concentration lapses was obtained through NOEBHC and medications obtained from there were somewhat helpful.   As was reported at her most recent visit there, plaintiff sometimes experienced visual hallucinations in the form of shadows.   Other symptoms included a lack of energy, crying spells once or twice per month, episodes of rage, and anti-social tendencies.   The maximum that she could lift was five to ten pounds, albeit with pain.   (Tr. pp. 35-38).

Pat Green, a VE, was next to take the stand.   She first testified that plaintiff's description of her past work as a CNA was consistent with that as set forth in the Dictionary of Occupational Titles where it was described as medium level, semi-skilled work with an SVP of 4.   Other past relevant work included cleaner/housekeeper, light-level, unskilled work with an SVP of 2, and cashier, which was light-level as well with an SVP of 2.   The ALJ then posed a hypothetical question to the VE which assumed an individual who could lift and carry a maximum of twenty pounds, ten pounds frequently; who could walk, stand, and sit four to five hours per eight-hour workday in increments of thirty minutes and with a sit/stand option; who could occasionally stoop; and, who could grasp, turn, hold, and use her fingers for fine manipulation. With those limitations in mind, the VE testified that the

individual described in the hypothetical question would be unable to perform plaintiff's past work.  (Tr. pp. 39-40).

To the hypothetical question as originally framed the ALJ then added that, taking into account pain, depression, and medication side-effects, the individual was still able to use short-term memory and was able to understand, remember, and carry out simple instructions.  However, she could not work in positions with constant supervision but could work in positions where contact with the supervisor occurred two, three, or four times during both morning and afternoon shifts.  Additionally, she was able to work in close proximity to and with co-workers but would have marked limitations in the ability to maintain attention and concentration for extended periods where the job instructions were detailed and complex. Further, she was able to complete work tasks in a normal workday at a consistent pace provided that there were no hourly production quotas.  In light of all those limitations, the VE testified that the described individual could function as a ticket seller, hand packager, and small product assembler, with significant numbers of such jobs existing in the national and local economics.  (Tr. pp. 40-41).

Upon being tendered to plaintiff's counsel for further questioning, the VE was asked to opine on the available job pool if the individual described in the hypo was unable to sustain a consistent pace sufficient to accomplish job requirements as are

customarily required.  In answer to that question, the VE testified that such an individual would not be able to perform the jobs that she had identified.  (Tr. pp. 41-42).

Plaintiff challenges the Commissioner's decision to deny her DIB and SSI benefits on three grounds.  In the first of those, plaintiff argues that the ALJ accorded weight to the opinion of a SDM in violation of Social Security Administration ("SSA") Memorandum 10-1691, Social Security Ruling ("SSR") 06-3p, and SSR 96-5p.  (Rec. doc. 13-1, pp. 14-15).  Plaintiff argues that "[b]y according significant weight to the SDM finding that [p]laintiff [w]as not disabled, the ALJ abdicated his statutory duty to independently determine whether [p]laintiff was disabled."  (Id.).

On September 14, 2010, the Commissioner's Chief ALJ issued a memorandum stating that the findings made by SDMs are not opinion evidence that ALJs should consider and address in their decisions. See James v. Astrue, No. 11-CV-2129, 2013 WL 443846 at *3 (W.D. La. Jan. 17, 2013).  On October 11, 2010, less than one month later, plaintiff's file was reviewed at the initial level by personnel from the State DDS which included a SDM and a PC, the latter of whom is an acceptable medical source under 20 C.F.R. §§404.1513(a)(2), 404.1527(e), 416.913(a)(2), and 416.927(e). (Tr. pp. 43, 44).  After doing so, the SDM and the PC respectively made findings respecting plaintiff's physical and mental impairments including a physical residual functional capacity ("RFC")

27

assessment and a psychiatric review technique assessment. (Tr. pp. 45-55, 56-66). On the last page of each of those two forms, both the PC and the SDM electronically affixed their signatures "...attest[ing] to the correctness and accuracy of the overall assessment..." (Tr. pp. 55, 66). The PC, Dr. Barnett, also signed a one-page "Case Analysis" form indicating that "[t]hese findings complete the medical portion of the disability determination." (Tr. p. 348).

On September 6, 2011, the ALJ issued his written decision denying plaintiff's applications for DIB and SSI benefits. (Tr. pp. 11-27). At steps two and three of the §§404.1520/416.920 sequential analysis, the ALJ found that plaintiff suffered from severe impairments in the form of back pain, anxiety, and depression but that those impairments did not satisfy the criteria of any of those set forth in the Listing of Impairments. (Tr. p. 17). The ALJ then made an assessment of plaintiff's RFC that was quite detailed. (Tr. p. 18). Following that finding, the ALJ methodically discussed all of the evidence supporting the RFC assessment, including plaintiff's hearing testimony and treatment records from Dr. Procell, MCLNO, AMC, and NOEBHC. (Tr. pp. 18-21). Within that lengthy discussion of the evidence, the ALJ briefly addressed the findings of the State DDS personnel, as follows:

> [a]s for the opinion evidence, the state agency reviewers found the claimant not disabled. I give this determination significant weight insofar as it is consistent with the record as a whole.

(Tr. p. 21).

The ALJ then summarized the evidence supporting his RFC assessment that plaintiff could perform less than a full range of light work activity before proceeding to steps four and five of the sequential analysis. (Tr. pp. 21-23).

The Court agrees with plaintiff that an ALJ may not properly rely upon the opinions of a SDM in making his disability determination. Here, however, there is some question as to the extent to which the ALJ did so. While the SDM undoubtedly signed both forms at the initial level of the Commissioner's administrative review process, the forms were also signed by Dr. Barnett, an acceptable medical source albeit in the field of psychology, attesting to the correctness and accuracy of the overall assessment. See, e.g., Schleuder v. Astrue, No. 09-CV-2370, 2012 WL 1739805 at *3 (D. Kan. May 16, 2012). Dr. Barnett also executed a separate Case Analysis form memorializing completion of the medical portion of the disability determination. Furthermore, the forms that were signed by the DDS personnel were filed in Section A of the administrative record ("Payment Documents and Decisions") rather than in Section F ("Medical Records") where the records of the various doctors who treated plaintiff can be found. See Brown v. Astrue, No. 11-CV-2461, 2012 WL 3644843 at *5 (D. Kan. Aug. 24, 2012). To the extent that the ALJ may have relied upon the findings of the SDM, he did so only "...insofar as

29

it [wa]s consistent with the record as a whole."

Even if the ALJ violated the Administration's guiding memorandum and regulatory directives, the question becomes whether that error was harmless.  James, 2013 WL 443846 at *3-4; Carter v. Astrue, No. 11-CV-508, 2012 WL 2135471 at *4 (M.D. Ala. June 13, 2012); Schleuder, 2012 WL 1739805 at *3.  A fair reading of the ALJ's decision reveals that he fully considered all the evidence of record before adjudicating plaintiff's entitlement to Social Security benefits and that he did not abdicate his duty in that regard.  This is confirmed by the fact that the ALJ's RFC assessment was more restrictive than that of the DDS personnel: plaintiff's ability to walk, stand, and/or sit was not only more limited in terms of the total time that she could perform such activities, but the ALJ added the requirement that the activities be performed in increments of thirty minutes with an option to alternate sitting and standing.  Whereas the DDS personnel had imposed no postural limitations, the ALJ found that stooping was limited to only occasionally.

On the non-exertional front, although the DDS personnel had found that the limitations resulting from plaintiff's mental impairments did not significantly affect her overall mental or behavioral functioning, the ALJ excluded work where there was constant supervision or hourly quotas, work with greater than three to four direct supervisory contacts in each morning and afternoon

shift, and work involving complex and detailed job instructions. Because the Court believes that the ALJ's assessment of the evidence that was before him was a correct one, the ALJ's reliance on the SDM's opinions, to the extent that he did so, was harmless.

Plaintiff's second challenge to the Commissioner's decision is that the decision does not account for the evidence contained in Exhibit 13F which establishes additional non-exertional limitations. (Rec. doc. 13-1, pp. 15-17). She argues that "Exhibit 13F was submitted to the Appeals Council and contains evidence that [p]laintiff's psychiatric medications, Zoloft and Trazodone, were not working and had to be increased in both October 2010 (Tr. at 359-60, 417) and November 2010 (Tr. at 455)." (Id. at p. 16). Plaintiff further argues that because the ALJ and the PC did not have the benefit of such evidence, their findings and opinions on the functionally limiting effect of her mental impairments are not supported by substantial evidence. (Id.). Plaintiff also argues that the exhibit in question establishes that she experiences incontinence that would preclude the performance of work activities which was not included in the ALJ's RFC assessment or in his hypothetical question to the VE. (Id. at pp. 16-17).

As noted earlier, on September 30, 2010 (not October of 2010), plaintiff was seen by Dr. Sack of MCLNO for medication management/follow-up for her depressive disorder. At that time, plaintiff denied any complaints and reported some improvement with

her mood which was "okay".  Although her affect was constricted, she was less irritable and agitated, thought processes were linear and goal-directed, there were no suicidal/homicidal ideations, insight was limited, and judgment was fair.  Plaintiff did harbor some aggressive thoughts towards others when she was irritable and she thus tended to isolate herself.  The dosages of Zoloft and Vistaril (but not Trazodone) were increased.  (Tr. pp. 359-360, 417).  Despite the obligation that is imposed on claimants to provide the Administration with medical evidence establishing their disability, 20 C.F.R. §§404.1512(a) and 416.912(a), plaintiff failed to provide the Administration with a copy of Dr. Sack's September 30, 2010 treatment note.  It was thus not considered by the DDS personnel when they rendered their initial level determination on October 11, 2010.

Plaintiff returned to Dr. Sack on October 21, 2010 (not November of 2010) and reported an increase in her anxiousness and depression following an attack the previous week along with anhedonia, crying spells, anger, irritability and social isolation. She was cooperative on mental status examination and had a blunted affect and sad mood but thought processes continued to be linear and goal-directed and ideations were denied.  Judgment and insight were average.  While the dosage of Zoloft was increased from 100 mg. to 150 mg. daily, the dosage of Trazodone was left at 150 mg. and was simply adjusted from a "prn" ("as needed") basis to an

unspecified "scheduled" basis.  (Tr. p. 445).  By the next time she was seen for her mental impairments at NOEBHC on February 23, 2011, she was much more positive and upbeat and had an appropriate mood and affect.  (Tr. pp. 356-358).

The ALJ issued his written decision on plaintiff's applications for Social Security benefits on September 6, 2011. (Tr. pp. 11-27).  While the decision admittedly contains no specific mention of Dr. Sack's two treatment notes, the ALJ did acknowledge plaintiff's hearing testimony that Trazodone was not completely effective in addressing her sleep problems and that the medications that she took were only somewhat helpful.  (Tr. p. 19). Taking into account the limitations resulting from plaintiff's mental impairments, the ALJ included in his RFC assessment the ability to understand, remember, and carry out only simple instructions, the avoidance of work with constant supervision or hourly quotas, and a limitation on supervisory contacts.  (Tr. p. 18).

Following the issuance of the ALJ's decision, plaintiff filed a request for review by the AC and a letter brief in support thereof.  (Tr. pp. 9-10, 203-217).  The second issue that was presented for review was whether the ALJ had failed to fully and fairly develop the record in that the records that would ultimately become Exhibit 13F had apparently been electronically submitted to the Administration on June 17, 2011 but had not been assigned an

exhibit number and had not been mentioned in the ALJ's decision. (Tr. pp. 210, 216).  While plaintiff complained that the records as a whole had not been considered by the ALJ, she did not specifically argue that the increase in her medications, in and of itself, constituted evidence of further mental limitations that was not properly accounted for by the ALJ.  On June 15, 2012, the AC denied plaintiff's request for review of the ALJ's decision and formally acknowledged receipt of the additional medical records which it entered in the record as Exhibit 13F.  (Tr. pp. 1-5).

The fact that an individual suffers from an impairment, standing alone, does not compel the conclusion that he or she is disabled; rather, it must be shown that the impairment results in functional impairments that preclude the individual from engaging in any substantial gainful activity.  Hames v. Heckler, 707 F.2d 162, 165 (5th Cir. 1983).  The mere fact that a claimant's medications were increased or adjusted falls into the same category.  Indeed, when plaintiff was seen at NOEBHC on February 23, 2011, some months after her medications had been tweaked, she was much more upbeat and positive and reported cooking for recreation and being active in church.  Plaintiff was seen by Dr. Bourgeois the following day and stated that she was doing and feeling well without any symptoms; her depression and anxiety were declared to be stable.  That supports the inference that the adjustments to her medications resulted in an increase in her

functionality.  <u>Lovelace v. Bowen</u>, 813 F.2d 55, 59 (5th Cir. 1987)(condition that can reasonably be remedied by medication is not disabling).  Based upon a reading of the ALJ's decision, it is apparent that he was aware of plaintiff's complaints regarding the complete effectiveness of her medications.  It is also clear that the ALJ was aware of the limitations resulting from plaintiff's mental impairments as he included various restrictions resulting therefrom in both his hypothetical question to the VE and in the RFC assessment that he ultimately arrived at.  The Court believes that the ALJ's assessment was a correct one.

As respects plaintiff's report of incontinence as reflected by the medical records of March 1, 2011, the Court first notes that this condition was not identified as a disabling impairment in plaintiff's applications for benefits and related paperwork.  <u>Pierre v. Sullivan</u>, 884 F.2d 799, 802 (5th Cir. 1989).  The Court also notes that while plaintiff complained of urgency over the previous five years, she was apparently able to work in spite of that condition.  <u>Vaughan v. Shalala</u>, 58 F.3d 129, 131 (5th Cir. 1989).  This is further confirmed by plaintiff's statements to Dr. Cantillo that she had not had to limit her activities because of it.  Plaintiff also gave no testimony that she had any work-related limitations due to incontinence which suggests that any problems that she may have had in that regard were resolved by her May 11, 2011 surgery.  And despite the VE being tendered to plaintiff's

counsel for questioning, he did not include any specific incontinence-related limitations in the hypothetical question posed to the VE. This challenge is without merit.

In her third and final challenge to the Commissioner's decision, plaintiff complains that the ALJ's written opinion does not contain an affirmative finding on her ability to sustain work at a consistent pace. (Rec. doc. 13-1, pp. 17-18). Plaintiff argues that while the ALJ's hypothetical question to the VE at the administrative hearing explicitly included the ability "...to complete work tasks in a normal workday at a consistent pace provided that there are no[] hourly production quotas", the RFC assessment in the ALJ's written opinion states only that plaintiff "...could not function in positions where there is constant supervision or where there are hourly quotas..." (Id.).

As noted by the government, inherent in an ALJ's RFC assessment is a finding that the claimant can perform work on a regular and continuing basis. 20 C.F.R. §§404.1545(b), (c), 416.945(b), (c). This is further made clear in SSR 96-8p, 1996 WL 374184 at *1-2. The ALJ's hypothetical question to the VE reasonably incorporated the limitations supported by the evidence of record and provided sufficient support for the conclusion that plaintiff was not disabled. Morris v. Bowen, 864 F.2d 333, 336 (5th Cir. 1988). And contrary to plaintiff's suggestion, the evidence contained in Exhibit 13F does not necessarily establish that her

36

mental impairments are more limiting than the ALJ found.  At best, it simply establishes that some adjustments to plaintiff's medications were necessary to bring them to a level at which she could function in a work setting.  And, as no incontinence-related limitations were testified to by plaintiff at the administrative hearing, it is reasonable to assume that any such limitations were alleviated by her May 11, 2011 surgery.

### RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this 13th day of _____September_____,
2013.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE